**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AMERICAN FEDERATION OF STATE,               Case No. 1:12-cv-02237 JPO
COUNTY AND MUNICIPAL EMPLOYEES        :
DISTRICT COUNCIL 37 HEALTH & SECURITY        Honorable J. Paul Oetken
PLAN and SERGEANTS BENEVOLENT     :
ASSOCIATION HEALTH AND WELFARE
FUND,                                                           :

                                    Plaintiffs,         :

                    - against -                           :

PFIZER INC.,                                             :

                                    Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DEFENDANT PFIZER INC.'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

Sheila L. Birnbaum                              John H. Beisner (admitted PHV)
Katherine Armstrong                          SKADDEN, ARPS, SLATE,
SKADDEN, ARPS, SLATE,                      MEAGHER & FLOM LLP
  MEAGHER & FLOM LLP                    1440 New York Avenue, N.W.
Four Times Square                              Washington, DC 20005
New York, NY  10036                         Tel: (202) 371-7000
Tel.: (212) 735-2450                            Fax: (202) 393-5760
Fax: (917) 777-2450                            Email: John.Beisner@skadden.com
Email:  Sheila.Birnbaum@skadden.com
Email:  Katherine.Armstrong@skadden.com    *Counsel for Defendant Pfizer Inc.*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................iii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT.......................................................................................................................... 5

I.      The Insurers Fail To Adequately Allege RICO Predicate Acts ............................... 7

        A.      The Insurers Fail to Adequately Allege Any Acts That Could Plausibly
                Constitute Mail or Wire Fraud ........................................................................ 7

                1.      The Insurers' Claim That Pharmacists Did Not Report
                        Consumers' Use of Coupons Fails to Allege a Scheme to Defraud ........ 9

                2.      Allegations Regarding Pfizer's Reports of "Benchmark" Prices
                        Cannot Support A Scheme to Defraud ................................................... 10

        B.      The Insurers Do Not Adequately Allege Scienter ......................................... 11

II.     The Insurers Have Failed To Allege A Cognizable Theory Of RICO Injury ......... 12

        A.      The Insurers Cannot Recover Under an "Excess Prescriptions" Theory for
                the Cost of Prescriptions That Provided Their Intended Benefits to Patients..... 12

        B.      The Insurers Cannot State a Cognizable Injury Under Their "Excess Price"
                Theory ............................................................................................................ 15

III.    The Insurers Fail to Adequately Plead That The Alleged Predicate Acts Were
        Conducted Through A RICO Enterprise ................................................................. 17

IV.     The Insurers Have Not Adequately Alleged RICO Causation................................ 18

        A.      The Insurers' Excess Prescriptions Claim Is Too Attenuated to Satisfy
                RICO's Proximate Cause Requirement ......................................................... 18

        B.      The Insurers' Excess Price Theory Fails for Lack of Causation.................... 22

V.      The Insurers' Complaint Fails To State a Claim Under the Robinson-Patman Act
        and Must Be Dismissed.......................................................................................... 23

        A.      The Insurers' Complaint Does Not State a Claim for Commercial Bribery ...... 24

                1.      The Insurers Do Not Allege Any Payments to a Fiduciary .................... 25

2.      The Insurers Do Not Allege That Consumers Who Participated in
        Pfizer's Co-Pay Subsidy Programs Knowingly Accepted Bribes .......................... 26

3.      The Insurers Do Not Allege That the Co-Pay Subsidy Programs
        Are Secret ................................................................................................................... 26

B.      The Insurers Do Not Have Antitrust Standing to Pursue Their Claim ............................... 27

CONCLUSION ................................................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

*2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732 (3d Cir. 2004) ...................... 24, 27

*In re Actimmune Marketing Litigation*, 614 F. Supp. 2d 1037(N.D. Cal. 2009),
    *aff''d*, 464 F. App'x 651 (9th Cir. 2011) .................................................................................. 21

*Allstate Insurance Co. v. Advanced Health Professionals, P.C.*,
    256 F.R.D. 49 (D. Conn. 2008) ............................................................................................ 12

*Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85 (2d Cir. 1999) ...................................... 6

*Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98 (2d Cir. 2012) ...................................... 5, 6

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ............................................................ 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. 6, 9

*Associated General Contractors of California, Inc. v. California State Council of*
    *Carpenters*, 459 U.S. 519 (1983) ....................................................................................... 27

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178 (3d Cir. 1997) .................. 27

*In re Bextra & Celebrex Marketing Sales Practices & Products Liability Litigation*,
    No. 11-CV-00310, 2012 WL 3154957 (N.D. Cal. Aug. 2, 2012) ........................................ 21, 22

*Blue Tree Hotels Investment (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
    369 F.3d 212 (2d Cir. 2004) ........................................................................................ 24, 25, 26

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) ............................................... 23

*Burge v. Bryant Public School District*, 520 F. Supp. 328 (E.D. Ark. 1980),
    *aff'd*, 658 F.2d 611 (8th Cir. 1981) ................................................................................. 26, 27

*Carter v. Berger*, 777 F.2d 1173 (7th Cir. 1985) ..................................................................... 17

*Chanayil v. Gulati*, 169 F.3d 168 (2d Cir. 1999) ................................................................... 7, 8

*Cruz v. FXDirectDealer, LLC*, 855 F. Supp. 2d 89, 99 (S.D.N.Y. 2012) .................................. 18

*Dayton Superior Corp. v. Marjam Supply Co.*, No. 07 CV 5215,
    2011 WL 710450 (E.D.N.Y. Feb. 22, 2011) ........................................................................ 25

*DDR Construction Servs., Inc. v. Siemens Industries, Inc.*,
    770 F. Supp. 2d 627 (S.D.N.Y. 2011) .................................................................................. 19

*Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) ................................................. 13

*Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*,
  441 F. Supp. 2d 695 (M.D. Pa. 2006) ........................................................ 28

*District 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508 (D.N.J. 2011) ............... 13, 21

*First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ............... 11

*FTC v. Henry Broch & Co.*, 363 U.S. 166 (1960) ..................................................... 23

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 447 F. Supp. 867 (S.D.N.Y. 1978),
  *rev'd on other grounds*, 602 F.2d 1025 (2d Cir. 1979) ............................................ 26

*GE Investors v. General Electric Co.*, 447 F. App'x 229 (2d Cir. 2011) ...................................... 5

*Graziano v. Pataki*, 689 F.3d 110 (2d Cir. 2012*)* ....................................................... 6

*Gregoris Motors v. Nissan Motor Corp. in USA*, 630 F. Supp. 902 (E.D.N.Y. 1986) ........................... 25, 27

*Gross v. Waywell*, 628 F. Supp. 2d 475 (S.D.N.Y. 2009) .................................................... 7

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) .................................... 16, 17

*Health Care Service Corp. v. Olivares*, No. 2:10-CV-221, 2011 WL 4591913, at *5
  (E.D. Tex. Sept. 2, 2011), *magistrate report adopted*, No. 2:10-CV-221,
  2011 WL 4591915 (E.D. Tex. Sept. 30, 2011)) ...................................................... 13, 21

*Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364 (D.N.J. 2004) ................................................... 13

*Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393 (6th Cir. 2012*)* ........................... 6

*Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010) .............................................. 19

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) ...................................... 19

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ............................................. 5, 16, 17, 28

*International Brotherhood of Teamsters, Local 734 Health & Welfare Trust
  Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999) ........................................... 16

*Ironworkers Local Union 68 v. AstraZeneca Pharmaceutical, LP*,
  634 F.3d 1352 (11th Cir. 2011) ................................................................ *passim*

*Ironworkers Local Union No. 68 v. AstraZeneca Pharmaceuticals LP*,
  585 F. Supp. 2d 1339 (M.D. Fla. 2008), *aff'd*, 634 F.3d 1352 (11th Cir. 2011) ...................... 21

*Kramer v. Lockwood Pension Servives, Inc.*, 653 F. Supp. 2d 354 (S.D.N.Y. 2009) ...................... 6, 10

*Mathon v. Feldstein*, 303 F. Supp. 2d 317 (E.D.N.Y. 2004) .............................................. 11

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)................................................................ 6, 10

*MLSMK Investment Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137 (S.D.N.Y. 2010),
    *aff'd in part*, 431 F. App'x 17 (2d Cir. 2011),
    *and aff'd*, 651 F.3d 268 (2d Cir. 2011) ...................................................................... 7, 12

*Monsieur Touton Selection, Ltd. v. Future Brands, LLC*,
    No. 06 Civ 1124, 2006 WL 2192790 (S.D.N.Y. Aug. 1, 2006)........................................ 26

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*,
    257 F.R.D. 315 (D. Mass. 2009) .................................................................................... 15

*Paycom Billing Services, Inc. v. Mastercard International, Inc.*,
    467 F.3d 283 (2d Cir. 2006)........................................................................................... 27

*Pennsylvania Employees Benefit Trust Fund v. AstraZeneca Pharmaceuticals, LP*,
    No. 6:09-cv-5003, 2009 WL 2231686 (M.D. Fla. July 20, 2009) ............................... 21, 22

*In re Pharmaceutical Average Wholesale Price Litigation*, 230 F.R.D. 61 (D. Mass. 2005)...................... 11

*Philip Morris, Inc. v. Grinnell Lithographic Co., Inc.*, 67 F. Supp. 2d 126 (E.D.N.Y. 1999) ................ 25, 27

*Port Dock & Stone Corp. v. Oldcastle Northeast., Inc.*,  No. 05 Civ. 4294, 2006 WL
    2786882 (E.D.N.Y. Sept. 26, 2006), *aff'd*, 507 F.3d 117 (2d Cir. 2007)........................ 27

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478 (2d Cir. 1995)........................ 9

*In re Rezulin Products. Liability Litigation*, 210 F.R.D. 61 (S.D.N.Y. 2002)............................................. 13

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir.
    1994)............................................................................................................................... 18

*Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir. 1998).............................................. 11

*Roosevelt Savings Bank v. Eveready Maintenance Supply Co.*,
    No. 85 CV 245, 1987 WL 30194 (E.D.N.Y. Dec. 2, 1987) ...................................... 25, 27

*Rosenson v. Mordowitz*, No. 11 Civ. 6145, 2012 WL 3631308 (S.D.N.Y. Aug. 23, 2012).................. 5, 7, 17

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
    678 F.3d 235 (3d Cir. 2012)........................................................................................... 14

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774,
    2010 WL 2346624 (D.N.J. June 9, 2010), *aff'd*, 678 F.3d 235 (3d Cir. 2012) ........... 13, 14

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
    No. 2:06-cv-5774, 2009 WL 2043604 (D.N.J. July 10, 2009).................................. 21, 22

*Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367 (3d Cir. 1985) .................................................. 24

*Sergeants Benevolent Association Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
    No. 08-CV-0179, 2011 WL 824607 (E.D.N.Y. Feb. 16, 2011), *magistrate report
    adopted*, 2011 WL 1326365 (E.D.N.Y. Mar. 30, 2011) ................................................... 20

*Sergeants Benevolent Association Health & Welfare Fund v. Sanofi-Aventis
    U.S. LLP,* No. 08-CV-0179, 2012 WL 4336218 (E.D.N.Y. Sept. 17, 2012) ............................ 20, 23

*Service Employees International Union Health & Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068 (D.C. Cir. 2001) .................................................................................. 16

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ..................................................... 12

*Southeast Laborers Health & Welfare Fund v. Bayer Corp.*,
    444 F. App'x 401 (11th Cir. 2011)............................................................................... 21

*Southeast Laborers Health & Welfare Fund v. Bayer Corp.*,
    655 F. Supp. 2d 1270 (S.D. Fla. 2009)......................................................................... 22

*Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 713 F. Supp. 937 (E.D. Va. 1989),
    *aff'd*, 903 F.2d 988 (4th Cir. 1990) ............................................................................ 26

*UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010),
    *cert. denied*, 131 S. Ct. 3062 (2011) ........................................................ 4, 19, 20, 21, 22, 23

*United Food & Commercial Workers Central Pennsylvania & Regional Health
    & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010) ...................................... 9, 20, 21

*United Magazine Co. v. Murdoch Magazines Distribution, Inc.*,
    146 F. Supp. 2d 385(S.D.N.Y. 2001), *aff'd sub nom. United Magazine Co. v.
    Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008)................................................... 25

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047 (9th Cir. 2011)* ...................... 6

*Vaughn v. Air Line Pilots Association*, 377 F. App'x 88 (2d Cir. 2010)....................................... 12

*In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, No. 05-3700,
    2010 U.S. Dist. LEXIS 142767 (E.D. La. Mar. 31, 2010) ............................................... 22

*In re Yasmin & Yaz (Drospirenone) Marketing, Sales Practices & Prods. Liability
    Litigation,* MDL No. 2100, 2010 WL 3119499 (S.D. Ill. Aug. 5, 2010) ................................. 21, 22

*Zeller Corp. v. Federal-Mogul Corp.*, No. 3:95CV7501, 1996 WL 903951
    (N.D. Ohio July 25, 1996)........................................................................................ 25

*In re Zyprexa Products Liability Litigation*, 671 F. Supp. 2d 397 (E.D.N.Y. 2009)............................... 20, 22

## STATUTES AND RULES

15 U.S.C. § 13(c) ........................................................................................................ 3, 23

18 U.S.C. § 1961(1)(B) ........................................................................................... 2, 7

18 U.S.C. § 1962(c) .............................................................................................. 3, 17

42 U.S.C. § 1395w-3a(c)(6)(B) ................................................................................ 11

Federal Rule of Civil Procedure 12(c) ....................................................................... 1

Federal Rule of Civil Prodcure 9(b) .............................................................. 1, 6, 10, 11

## <u>OTHER AUTHORITIES</u>

14 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust*
    *Principles and Their Application* (3d ed. 2012) ............................................. 26

Restatement (Third) of Agency § 1.01 (2006) ............................................................ 25

Letter from FTC Bureau of Competition to Maritz, Inc. (June 21, 1984), *reported in* 47
    Antitrust & Trade Reg. Rep. (BNA) 16 (July 5, 1984) ................................... 26

Defendant Pfizer Inc. ("Pfizer") submits this memorandum of law in support of its Motion to Dismiss the First Amended Class Action Complaint ("Compl.") pursuant to Federal Rules of Civil Procedure 12(c) and 9(b).

## PRELIMINARY STATEMENT

The named Plaintiffs in this case are two healthcare benefit funds (the "Insurers") that seek to represent a nationwide class of insurance companies, health maintenance organizations, and other healthcare funds that provide prescription drug benefits to their respective members and policyholders. The members of the proposed class include some of the world's largest and most sophisticated business entities, which have the largely unfettered wherewithal to design and sell whatever health insurance products they determine would be profitable.

Health insurers are not required to provide pharmaceutical benefits to their subscribers at all. Those that do, like the named Plaintiffs in this case, generally employ drug formularies. Formularies are tiered lists of prescription drugs for which the insurer will pay under the plan. Drugs are typically categorized on a formulary as generic (tier 1), preferred brands (tier 2), or non-preferred brands (tier 3). A patient whose physician deems it medically necessary to prescribe a medication that is on tier 3 generally must pay higher out-of-pocket co-payments to obtain that medication.

Pfizer, like other pharmaceutical companies, offers consumers coupons and savings cards to defray the increased co-pay costs for certain of its products.[1] These coupon programs inarguably benefit consumers by facilitating a patient's purchase of prescription drugs that are, by definition, deemed medically necessary by his or her doctor. They also foster patient compliance with doctors' prescribing instructions by, *inter alia*, reducing a cost burden that might otherwise cause some consumers to try to save money by skipping doses or splitting pills.

Ignoring the fact that coupon programs reduce consumer costs and promote public health, the Insurers seek to extinguish those programs because they supposedly undermine their business model. In

---

[1]   The six Pfizer medications that are at issue in this case are Celebrex, Chantix, Effexor XR, Geodon, Lipitor, and Pristiq.

essence, the Insurers allege that the programs disturb the economic incentives and disincentives for physician/patient drug choices created by their traditional tiered formularies.  Tellingly, the Insurers admit they were "generally aware" of Pfizer's co-pay assistance programs, which, far from being secret, were "open and notorious."  (Compl. ¶¶ 56, 173.)  Yet the Insurers elected not to exercise any of the readily available options they could have used to ameliorate the supposedly devastating impact of coupon programs on their businesses.  For example:

- The Insurers could have required their patients to receive prior authorization before obtaining brand-name drugs – but they did not.

- The Insurers could have mandated that their patients first try and fail on less expensive therapeutic alternatives (that is, engage in "step therapy") before allowing coverage of a branded product – but they did not.

- The Insurers could have eliminated coverage for branded medications where there is a generic equivalent or therapeutic alternative – but they did not.

- Or the Insurers could have restricted beneficiaries' use of co-pay subsidies or banned their use entirely – but they did not.

In short, the Insurers could have designed and sold health plans with substantially more restricted treatment options – and presumably charged less for those plans.  Instead, the Insurers opted to continue selling their customers (and charging them for) medical insurance policies that purported to afford patients a broad array of therapeutic options, limited only by the traditional tiered formularies described above.  But now, as insurers have done in other litigation,[2] Plaintiffs are asking this Court to step in and do what the Insurers themselves knowingly opted not to do – to limit physician/patient treatment options by barring the use of co-pay coupons.  More specifically, the Insurers now ask this Court to declare Pfizer's coupon programs illegal under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").  Further, the Insurers allege that Pfizer has paid illegal "kickbacks" to Plaintiffs' insureds in

---

[2] *Cf. Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1360 (11th Cir. 2011) (observing that the insurer plaintiffs "consciously exposed themselves" to the higher prescription costs for which they sought to recover in litigation).

violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).  Having charged their customers for access to therapy options, the Insurers now demand that this Court take back those options.  And they want to impose on Pfizer treble damages for having facilitated insureds' access to the treatment options they were promised.  To say the least, these claims are a case study in overreaching; they are fundamentally flawed and should be dismissed.

<u>The RICO Claim</u>

Describing co-pay assistance programs as "kickbacks," the Insurers present two theories of liability.  Their "Excess Prescriptions" theory asserts that the programs cause the Insurers to pay for more prescriptions of branded drugs than would otherwise occur by interfering with their cost-sharing provisions. (*See, e.g.*, Compl. ¶ 16.)  The Insurers' "Excess Price" theory alleges that Pfizer wrongfully failed to account for the effect of co-pay assistance programs in reporting certain unspecified "benchmark" prices used by the Insurers in calculating drug reimbursement.  (*See, e.g., id.* ¶ 14.)  But the Insurers do not allege facts central to a valid RICO claim:  predicate acts constituting a "pattern of racketeering activity."  18 U.S.C. § 1962(c).  Here, the Insurers purport to base their RICO claims on alleged violations of the federal mail fraud and wire fraud statutes (*see* Compl. ¶¶ 217-221), which requires that they plead with particularity that Pfizer engaged in a scheme to defraud.  The Insurers do not identify a single actionable misrepresentation or omission by Pfizer that purportedly caused doctors to prescribe, patients to purchase, or the Insurers to reimburse for branded Pfizer drugs.

The Insurers have also failed to allege a cognizable RICO injury.  Their "Excess Prescriptions" theory alleges that Pfizer's coupon programs enabled their members to purchase prescription drugs that are undisputedly effective rather than switching to less expensive alternative drugs.  However, numerous courts have held that a plaintiff sustains no economic injury in paying for a prescription drug that effectively treated the condition for which the drug was prescribed.

The Insurers' "Excess Price" theory likewise fails to allege a cognizable injury because, absent contrary allegations, it is presumed that the Insurers use standard actuarial methods to account for any additional costs attributable to Pfizer's co-pay assistance programs by passing them on to patient beneficiaries and/or employers.

Moreover, the Insurers fail to allege a RICO enterprise that is distinct from Pfizer itself. The Insurers allege a RICO enterprise consisting of Pfizer and its agents TrialCard and PDMI, but it is well settled that a corporation's agents are not distinct from the corporation for RICO purposes, because a corporation can act only through its agents. The Insurers thus fail to adequately allege a RICO enterprise.

The Insurers also do not plead proximate causation under RICO. Their "Excess Prescriptions" theory is too attenuated to satisfy RICO's "direct injury" requirement. The Insurers do not claim that they relied on any communications with Pfizer when making reimbursement decisions. Instead, the Insurers' causal theory assumes that, but for Pfizer's conduct, thousands of unidentified non-party physicians would have prescribed a different medicine or treatment for their patients. Federal courts, including the Second Circuit, have repeatedly held that a causal theory that depends on prescribing decisions made by non-party physicians is too attenuated to satisfy RICO's proximate cause requirement. *See, e.g.*, *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 135 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 3062 (2011).

Even if this hurdle could be overcome, the Insurers have also failed to allege "but for" causation. The Complaint does not plead facts showing that any prescription written by any identified doctor to any identified patient would not have been written but for Pfizer's alleged conduct. Instead, the Insurers merely allege that Pfizer's coupon programs had an "[a]ggregate" impact on the prescribing rate of couponed drugs. (Compl. ¶ 192; *see also id.* ¶¶ 3, 38, 52.) The Second Circuit and numerous other federal courts have held that such aggregate allegations do not suffice where causation depends on inherently individualized decisions of treating physicians. *See UFCW*, 620 F.3d at 135.

The Insurers' "Excess Price" claim also fails for lack of causation because they do not allege that any third parties (*e.g.*, pharmacists or publishers) were deceived regarding the purported effect of co-pay assistance programs on any pricing benchmark. And the Insurers cannot allege that they themselves were deceived because the Insurers admit in the Complaint that they were aware of Pfizer's co-pay assistance programs (Compl. ¶ 173), the terms and conditions of which were publicly disclosed (*id.* ¶ 56).

The Robinson-Patman Act Claim

The Insurers' Robinson-Patman Act claim is equally misguided. The Insurers allege that the co-pay subsidy programs constitute commercial bribery prohibited under section 2(c) of the Robinson-

Patman Act.  (Compl. ¶¶ 6, 245-257.)  But the Insurers fail to state a claim for "commercial bribery" for three reasons.  First, they do not claim that the alleged "bribes" caused individual insureds to breach any fiduciary duty owed to their insurers, which is a required element.  Second, the Insurers' allegations foreclose any assertion that their members knowingly accepted a bribe.  Commercial bribery requires guilty participation by both the giver and the recipient of the bribe.  Third, having admitted in their Complaint that they were "generally aware" of Pfizer's "open and notorious" co-pay subsidy programs, the Insurers do not and cannot claim that the alleged "bribes" occurred in secret, as is required to state a claim for commercial bribery.  In addition, the Insurers lack antitrust standing under Section 4 of the Clayton Act because they are neither competitors of Pfizer nor consumers of Pfizer's products.  Even if the Insurers could be characterized as "buyers" of Pfizer's prescription drugs, they still would be unable to establish standing because they do not make purchases directly from Pfizer.  Under long-standing Supreme Court precedent, indirect purchasers lack standing to pursue claims under Section 4 of the Clayton Act.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977).

Accordingly, the Insurers have failed to allege facts plausibly supporting either a RICO or Robinson-Patman Act claim, and their complaint should be dismissed.

## ARGUMENT

In order "[t]o survive a motion to dismiss [under Rule 12(c)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 107 (2d Cir. 2012); *GE Investors v. Gen. Elec. Co.*, 447 F. App'x 229, 230 (2d Cir. 2011).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted) (quoting *Twombly*, 550 U.S. at 555, 557); *accord GE Investors*, 447 F. App'x at 230; *see also Rosenson v. Mordowitz*, No. 11 Civ. 6145, 2012 WL 3631308, at *3 (S.D.N.Y. Aug. 23, 2012) (Oetken, J.) (observing that "'[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice'" (quoting *Iqbal*, 556 U.S. at 678)).[3]

The Insurers' RICO claims are subject to an even higher standard – the particularized pleading requirements of Federal Rule of Civil Procedure 9(b).  *See Anschutz Corp.*, 690 F.3d at 108; *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992).[4]  To satisfy Rule 9(b), the complaint must "specify the statements that the plaintiff contends were fraudulent," "identify the speaker," and "state where and when the statements were made."  *Anschutz Corp.*, 690 F.3d at 108 (citation omitted) (internal quotation marks omitted); *see also McLaughlin*, 962 F.2d at 191 ("Pursuant to this higher pleading standard, the 'complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" (citation omitted)).  A neutral recitation of alleged statements by the defendant will not suffice; rather, a plaintiff must "'explain why the statements were fraudulent.'"  *Anschutz Corp.*, 690 F.3d at 108 (citation omitted); *see also Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) ("Even if we were to find that the time and content of those communications met the Rule 9(b) standard, plaintiffs' claim must be dismissed because they failed to allege how those statements were fraudulent."); *Kramer v. Lockwood Pension Servs., Inc.*, 653 F. Supp. 2d 354, 389 (S.D.N.Y. 2009) ("[T]o assert a RICO claim based upon mail or wire fraud, a 'complaint must . . . specify the statements that the plaintiff contends were fraudulent, . . . [and] explain why the statements were fraudulent.'" (citation omitted)).

As set forth below, the Insurers' claims fail these pleading standards for three reasons:  (a) they have not pled a predicate act under RICO, (b) they have not adequately alleged injury or causation, and (c) they have not adequately pled facts showing that the alleged predicate acts were committed through a RICO enterprise.

---

[3] The Rule 8(a) standards also apply to a motion for judgment on the pleadings under Rule 12(c). *See Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012); *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012).

[4] The requirements of Rule 9(b) apply to post-answer dispositive motions as well as to pre-answer motions. *See Heinrich*, 668 F.3d at 403 (6th Cir. 2012); *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1053 (9th Cir. 2011).

I.      **THE INSURERS FAIL TO ADEQUATELY ALLEGE RICO PREDICATE ACTS**

A.      **The Insurers Fail to Adequately Allege Any Acts That Could Plausibly Constitute Mail or Wire Fraud**

RICO is not an omnibus, catch-all statute intended to provide a federal remedy for any perceived wrongdoing a plaintiff may wish to pursue.  "The boundaries of RICO simply do not encompass the oversize capacity or elasticity to accommodate the many ill-fitting suits with which plaintiffs seek to outfit the statute." *Gross v. Waywell*, 628 F. Supp. 2d 475, 482-83 (S.D.N.Y. 2009).  To cabin RICO's breadth, Congress established very specific elements that must be alleged and proved.  More specifically, a RICO claimant's "pleadings must demonstrate . . . that while employed by or associated with an enterprise engaged in interstate or foreign commerce, and through the commission of at least two predicate acts constituting a 'pattern of racketeering,' the defendant directly or indirectly conducted or participated in the conduct of the affairs of such enterprise." *Id.* at 485 (citing 18 U.S.C. § 1962(c)); *accord Rosenson*, 2012 WL 3631308, at *4.  Not any allegedly tortious conduct can give rise to a RICO claim.  Rather, a plaintiff must allege that a defendant committed at least two of the criminal offenses enumerated in the statute. *Gross*, 628 F. Supp. at 485; *see also* 18 U.S.C. § 1961(1)(B) (defining "racketeering activity" as "any act which is indictable under any of the following provisions of title 18, United States Code," which include mail fraud and wire fraud).

Here, the Insurers attempt to shoehorn their claims into RICO by alleging violations of the federal mail fraud and wire fraud statutes.  (*See* Compl. ¶¶ 177-185).  Where a party asserts RICO claims based on mail or wire fraud, it must allege "'(1) the existence of a scheme to defraud, (2) defendants' knowing participation in such a scheme, and (3) the use of wire or mail communications in interstate commerce in furtherance of that scheme.'" *MLSMK Invs. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 142 (S.D.N.Y. 2010) (citation omitted), *aff'd in part*, 431 F. App'x 17 (2d Cir. 2011), *and aff'd*, 651 F.3d 268 (2d Cir. 2011); *accord Chanayil v. Gulati*, 169 F.3d 168, 170-71 (2d Cir. 1999).  As this Court has recently observed, RICO claims "merit particular scrutiny where, as here, the predicate acts are mail and wire fraud, and where the use of mail or wires to communicate is not in and of itself illegal, unlike other predicate acts such as murder or extortion." *Rosenson*, 2012 WL 3631308, at *4 n.3.

The Insurers' "threadbare recitals" of RICO's elements and "conclusory statements" that Pfizer committed mail or wire fraud simply do not suffice. While the Complaint describes at length the terms and conditions of the co-pay programs at issue, it does not identify a single false statement. Nor does it identify any undisclosed fact that Pfizer had a duty to share or any omission that was misleading. To the contrary, the Complaint implicitly concedes that Pfizer was completely transparent about its offering of co-pay assistance to consumers, the amount of such assistance, and the terms and conditions for participating in Pfizer's programs. Indeed, the Insurers expressly acknowledge that the terms and conditions of the programs were disclosed on Pfizer's website (Compl. ¶¶ 68, 87, 96, 114, 135) and advertised on television and in print media. (*Id.* ¶¶ 81, 119, 120.) And the Insurers admit that they were "generally aware" of Pfizer's co-pay assistance programs (*id.* ¶ 173), which they state were "open and notorious" (*id.* ¶ 56).

In an attempt to characterize Pfizer's fully disclosed, public co-pay assistance programs as fraudulent, the Insurers make the following allegations:

> 218. The co-pay subsidy enterprises engaged in intentional schemes to defraud plaintiffs and the classes by interfering with their cost-sharing provisions, causing them to pay for prescriptions of the subsidized drugs that they would not otherwise have paid for, and causing them to pay an inflated rate for each subsidized prescription. These transactions necessarily involve the use of the wires.

> 219. The co-pay subsidy enterprises engaged in separate but related intentional schemes to defraud plaintiffs and the classes by causing misrepresentations to be made via the wires at the time of the point of sale transaction – that is, when the member presents the co-pay card at the pharmacy – when as instructed by the defendants, the pharmacist electronically charges the health benefit provider the full benchmark price without accounting for the existence of co-pay subsidies. . . .

> 220. The co-pay subsidy enterprises engaged in separate but related intentional schemes to defraud plaintiffs and the classes by reporting benchmark prices to reporting agencies while failing to account for the routine waiver of co-pays. . . .

(Compl. ¶¶ 218-20; *accord id.* ¶¶ 184-85.)[5] These three conclusory allegations are the Insurers' sole

---

[5] The Insurers allege that Pfizer's co-pay assistance laws *would* violate the federal anti-kickback statute and a Massachusetts statute, if they were extended to persons insured by government programs and Massachusetts payors. But the Insurers concede that such persons are expressly excluded under the terms of the programs, (Compl. ¶ 36), and that no other state has a statute comparable to Massachusetts. (*See* Compl. ¶ 38.) The Insurers also allege that co-pay assistance constitutes the unlicensed provision of secondary insurance (*id.* ¶ 176), but this allegation is unsupported by any factual allegations. In any event, the Insurers' vague and conclusory allegations that the programs violate state law (which Pfizer denies) are insufficient to support their RICO claims because they are not
*(cont'd)*

attempt to allege mail and wire fraud violations.  Initially, the Insurers' claim that Pfizer "interfer[ed] with their cost-sharing provisions" (Compl. ¶ 218) cannot constitute a scheme to defraud because it alleges neither a misrepresentation nor an omission, much less that anyone (least of all the Insurers) was deceived by anything that Pfizer said or did.  The mere fact that the Insurers may believe that co-pay coupons are counter to their business objectives does not make those coupons fraudulent.  And, as discussed below, the allegations set forth in paragraphs 219 and 220 of the Complaint fail to allege sufficient facts under *Twombly* and *Iqbal* to plausibly state a claim for fraud, nor do they satisfy the particularized pleading requirements of Rule 9(b).

### 1.   The Insurers' Claim That Pharmacists Did Not Report Consumers' Use of Coupons Fails to Allege a Scheme to Defraud

At bottom, the Insurers admit that they were aware of the co-pay assistance programs, as well as their terms and conditions.  They allege only that they were unaware of which of their insureds were using coupons and the purchases on which they were being used.  However, the Insurers fail to allege a duty on Pfizer's part to disclose such information.  This is fatal to Plaintiffs' fraud claims.  *See Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995); *see also United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) (affirming dismissal of insurer's RICO claim that "did not identify statements or representations made by Amgen that were literally false or misleading at the time they were made" or "identify material omissions in derogation of an independent statutory or fiduciary duty to disclose").  Nor do the Insurers plausibly allege how they were misled, since they admit that they were aware of the programs – and were therefore on notice that some of their members were using co-pay coupons, even if they did not know their specific identities.

Instead of identifying any affirmative misrepresentation or actionable omission by Pfizer, the Insurers allege that, at the point of sale, "as instructed by the defendants, the pharmacist electronically

---

*(cont'd from previous page)*

among the enumerated statutory violations identified as "racketeering activity" for RICO purposes.  *See Chanayil*, 169 F.3d at 171 (affirming dismissal of RICO claims where alleged violations "do not concern any of the predicate acts enumerated in Section 1961(1) and thus fail to allege a 'pattern of racketeering activity'").

charges the health benefit provider the full benchmark price without accounting for the existence of co-pay subsidies." (Compl. ¶ 219.) As a result, according to the Insurers, "the health benefit plans receive electronic records falsely indicating that the members paid their personal cost-share obligations." (Compl. ¶ 4.) Neither of these allegations supports the Insurers' claims of mail or wire fraud.

In the first place, the Insurers have alleged nothing that would allow them to hold Pfizer liable for a representation purportedly made by pharmacists, for they do not claim that the pharmacists were agents, co-conspirators, or members of a RICO enterprise with Pfizer.

Further, these allegations fall far short of the particularity required for pleading fraud under Rule 9(b), as they fail to specify the content of any such communications, when, where and by whom the representations were made, or why they were false. *See McLaughlin*, 962 F.2d at 191.[6] Indeed, nowhere in the Complaint do the Insurers identify a single record from any source indicating that "members paid their personal cost-share obligations." To the contrary, the factual allegations of the Complaint suggest that no such record exists because pharmacies "process [co-pay assistance programs] ***after*** the patient's primary insurance is processed." (Compl. ¶ 72 (emphasis added); *id.* ¶ 22 (explaining that "[i]nformation regarding the extent of the co-pay subsidy or rebate is . . . computed . . . only after the patient's primary insurance is processed (and billed)".)

Finally, a pharmacy's alleged failure to disclose to the Insurers the fact that a consumer used a coupon to pay for part of his or her co-pay cannot plausibly support a claim for fraud because the Insurers admit that their reimbursement of the pharmacy is separately determined by contract and thus does not depend on any representation at the point of sale. (*See* Compl. ¶ 58.)

### 2. Allegations Regarding Pfizer's Reports of "Benchmark" Prices Cannot Support A Scheme to Defraud

The Insurers also claim that Pfizer wrongfully failed to account for the effect of co-pay assistance programs in reporting certain "benchmark" prices used in calculating retail drug reimbursement. (Compl. ¶ 58.) Once again, the Insurers' allegations fail to comply with Rule 9(b). Significantly, while the Insurers

---

[6] Even if this were construed as an omission-based claim, the Insurers fail to identify any duty of a pharmacist to disclose the basis for the amount of the charge.

make references to Average Wholesale Price ("AWP") and Wholesale Acquisition Cost ("WAC") elsewhere in the Complaint (*id.* ¶ 57), they do not identify the specific benchmark they contend was falsely reported by Pfizer and how it impacted their reimbursement practices. *See Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 659 (3d Cir. 1998) (explaining that "[t]o link their own injuries to the alleged RICO enterprise, plaintiffs must allege what happened to them," as opposed to a putative class).

With respect to WAC, the Insurers cannot plausibly claim that Pfizer's reports were fraudulent because they did not reflect co-pay assistance provided to consumers because WAC is defined by federal statute as the price charged to **wholesalers** (not the retail price to consumers) **before** any discounts or rebates. *See* 42 U.S.C. § 1395w-3a(c)(6)(B) (defining WAC as "the manufacturer's list price for the drug or biological to **wholesalers or direct purchasers** in the United States, **not including prompt pay or other discounts, rebates or reductions in price**, for the most recent month for which the information is available, as reported in wholesale price guides or other publications of drug or biological pricing data." (emphasis added)).

Nor does the Complaint identify any misrepresentation that Pfizer made regarding the only other benchmark referenced, AWP, or how AWP could be impacted by a consumer's use of a co-pay coupon. AWP is not reported by pharmaceutical companies, but by independent publishers. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 67 (D. Mass. 2005). For branded drugs, it is generally a standard mark-up over WAC, *id.* at 68, which, as noted above, is an *undiscounted, wholesale price*. Co-pay assistance offered to consumers has no impact on a wholesaler's or pharmacy's acquisition cost. Absent from the Complaint is any allegation that would plausibly connect co-pay assistance to AWP or identification of any misrepresentations made by Pfizer regarding AWP.

### B.   The Insurers Do Not Adequately Allege Scienter

"The crux of mail fraud and wire fraud is 'an intent to defraud,'" which requires allegations "that the 'defendants contemplated some actual harm or injury to their victims.'" *Mathon v. Feldstein*, 303 F. Supp. 2d 317, 323 (E.D.N.Y. 2004) (citations omitted). Although intent may be alleged generally under Rule 9(b), the Insurers "'must allege facts that give rise to a strong inference of fraudulent intent.'" *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004) (citation omitted); *see also*

*MLSMK*, 737 F. Supp. 2d at 142 (requiring showing of "'both motive and opportunity to commit fraud'" or "'strong circumstantial evidence of conscious misbehavior or recklessness'" (citation omitted)).  As the Second Circuit has made clear, "'the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for [a] license to base claims of fraud on speculation and conclusory allegations.'" *Vaughn v. Air Line Pilots Ass'n*, 377 F. App'x 88, 90 (2d Cir. 2010) (alteration in original) (citation omitted).  Here, the Insurers' allegations fail for lack of factual allegations giving rise to a plausible inference of scienter.

The Insurers' allegations that merely "couple a factual statement with a conclusory allegation of fraudulent intent" are insufficient to allege scienter.  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).  Likewise, the Insurers' assertions that Pfizer intended to increase prescriptions for its products (*see* Compl. ¶¶ 20, 62) are inadequate because "[a] general interest in self-enrichment [is] insufficient to satisfy" the requirements for alleging scienter.  *Allstate Ins. Co. v. Advanced Health Prof'ls, P.C.*, 256 F.R.D. 49, 64 (D. Conn. 2008); *see also Shields*, 25 F.3d at 1130.  The fact that the existence, terms, and conditions of Pfizer's co-pay assistance programs were public is patently inconsistent with an intent to defraud, and the Insurers have alleged no facts plausibly giving rise to an inference of fraudulent intent.

## II.   THE INSURERS HAVE FAILED TO ALLEGE A COGNIZABLE THEORY OF RICO INJURY

The Complaint sets forth two theories of injury.  First, the Insurers claim that the co-pay assistance programs caused them "to pay for prescriptions of subsidized drugs that they would not otherwise have paid for" ("Excess Prescriptions").  (Compl. ¶ 218.)  Second, the Funds allege that they paid "an inflated rate for each subsidized prescription" ("Excess Price")  (*Id.*)  Neither contention is supported by sufficient factual allegations to be credited as presenting a plausible theory of injury.

### A.   The Insurers Cannot Recover Under an "Excess Prescriptions" Theory for the Cost of Prescriptions That Provided Their Intended Benefits to Patients

The Insurers do not allege that the Pfizer drugs for which coupons were redeemed were medically unnecessary or that any of their members failed to benefit from taking these drugs.  Instead, their "Excess Prescriptions" theory is that coupon programs enabled their members to purchase certain prescription drugs (that are undisputedly effective and permitted under the Insurers' plans) rather than switching to less

expensive alternative drugs that – despite the Insurers' assertions of therapeutic equivalence – are clearly not the preference of their insureds or their doctors.  This purported "injury" is not cognizable under RICO.

Courts have repeatedly held that a plaintiff sustains no economic injury in paying for a prescription drug that effectively and safely treated the condition for which the drug was prescribed.  *See, e.g.*, *Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1360 (11th Cir. 2011); *Health Care Serv. Corp. v. Olivares*, No. 2:10-CV-221, 2011 WL 4591913, at *5 (E.D. Tex. Sept. 2, 2011), *magistrate report adopted*, No. 2:10-CV-221, 2011 WL 4591915 (E.D. Tex. Sept. 30, 2011); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2010 WL 2346624, at *4 (D.N.J. June 9, 2010), *aff'd*, 678 F.3d 235 (3d Cir. 2012); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 520 (D.N.J. 2011); *Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364, 380 (D.N.J. 2004); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 68-69 (S.D.N.Y. 2002).[7]

In *Ironworkers*, several insurers brought suit against AstraZeneca, alleging that the company fraudulently induced physicians to prescribe the medication Seroquel for numerous off-label uses.  *See Ironworkers*, 634 F.3d at 1355-56.  The insurer plaintiffs claimed that AstraZeneca's allegedly fraudulent off-label marketing campaign caused them "'to unnecessarily pay for [the more expensive] Seroquel off-label prescriptions.'"  *Id.* at 1357 (quoting the Complaint).  As a result, the plaintiffs sought to recover under RICO the difference between the price of the off-label Seroquel prescriptions and the amount that would have been paid for the less expensive alternatives.  *Id.*

In holding that the case was properly dismissed, the Eleventh Circuit recognized that "for tort-based causes of action, the scope of potential economic injury arising from a . . . health insurer's [] purchases of prescription drugs is limited."  *Id.* at 1362.  This is so, the court explained, because a prescription of a medication is based on a doctor's medical judgment that he or she believes it will be beneficial to the

---

[7] *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), is not to the contrary.  In *Desiano*, insurers alleged that they directly relied on the defendants' misrepresentations regarding Rezulin's safety and that, but for those alleged misrepresentations, they would not have paid for Rezulin.  *See id.* at 349.  Here, the Insurers do not allege that the prescriptions for which they seek recovery were unsafe or ineffective.  And, while the *Desiano* plaintiffs alleged that they would have taken action to restrict access to Rezulin had they known of the allegedly withheld information, *see id.* at 349 n.9, the Insurers here admit that they are aware of the co-pay programs, but have done nothing in response to this knowledge.  *See supra* at 2, 8.

patient.  *Id.*  "In light of physicians' exercise of professional judgment," the court found, "a [health insurer] suffers no economic injury merely by being prescribed and paying for a more expensive drug."  *Id.* at 1363.  "Medically necessary and appropriate" does not mean "that it is the only drug that may be prescribed. . . . [S]everal drugs can be medically necessary and appropriate in treating a given condition."  *Id.* at 1360 n.20.  Rather, the plaintiff must also show that the medication was "unnecessary or inappropriate according to sound medical practice – i.e., the drug was either ineffective or unsafe for the prescribed use."  *Id.* at 1363.  Because the plaintiffs in *Ironworkers* pled no facts suggesting that the prescriptions were "unsafe or ineffective in treating the [enrollees'] condition," they had not "plausibly suffered economic injury caused by AstraZeneca's false representations."  *Id.* at 1363, 1369.

Likewise, in *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2010 WL 2346624 (D.N.J. June 9, 2010), the court dismissed the RICO claims of the insurer plaintiffs based on their failure to allege a "concrete financial loss to [their] business or property."  *Id.* at *4.  As the court explained, the plaintiffs failed to plead "facts asserting that the drug was either ineffective for the indication for which it was prescribed or unsafe."  *Id.*  Affirming the order of dismissal, the Third Circuit agreed with the district court's conclusion that the plaintiffs failed to plead a concrete injury under RICO.  *See In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 246 (3d Cir. 2012).

In this case, the Insurers do not contend that the "excess prescriptions" for which they seek to recover were medically unnecessary.  To the contrary, they seek to recover for prescriptions that physicians, in the exercise of their medical judgment, determined were the preferred treatment for their patients.  Their only purported grievance is that they believe less expensive alternatives were available (even though their formulary did not require the use of those alternatives).  Basically, the Insurers' position is that physicians should consider cost ahead of the best interests of their patients.  However, as the Eleventh Circuit explained, physicians do not "owe their patients a professional duty to consider a drug's price when making a prescription decision."  *Ironworkers*, 634 F.3d at 1363.  Accordingly, the Insurers cannot recover under their "Excess Prescriptions" theory.

**B.      The Insurers Cannot State a Cognizable Injury Under Their "Excess Price" Theory**

Under the Insurers' "Excess Price" theory, Pfizer's purported failure to disclose the routine use of co-pay coupons caused the Insurers to pay inflated prices by preventing the resulting discounts from being reflected in the "stated benchmark," which is understood to be "a reasonable estimate of the actual cost to the pharmacy on which the payer's reimbursement to the pharmacy is based." (Compl. ¶ 58.)

The Insurers' own allegations preclude recovery under this theory of injury.  As discussed above, the Insurers admit that they were aware of the programs and their terms.  *See supra* at 2, 8.  Although they contend they "cannot[] know which of the prescriptions that they have paid for have been subsidized" (Compl. ¶ 173), the Insurers do not tie this allegation to any plausible theory of injury.  As discussed above, the source of a patient's co-pay has no impact on the amount at which the pharmacy is reimbursed, which is tied to acquisition costs.  *See supra* Section I.A.2.  Further, the Insurers could have used various formulary controls to avoid the additional costs they claim result from co-pay assistance programs.  For example, as discussed previously, the Insurers could have used "preauthorization review" to monitor prescriptions on a case-by-case basis.  *See Ironworkers*, 634 F.3d at 1366.  Alternatively, the Insurers could have used "step therapy" to require that members try a cheaper alternative drug before obtaining coverage for more expensive branded drugs.  *Cf. In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 332 (D. Mass. 2009).  In order to take any of these steps – or to alter their reimbursement contracts with pharmacies – it was sufficient for the Insurers to know about the programs generally.  Having made the "conscious business decision" not to use such formulary or other controls despite their admitted awareness of co-pay subsidy programs, the Insurers "voluntarily assumed the risk of paying for all prescriptions" of the subject drugs at the established price.  *Ironworkers*, 634 F.3d at 1367.

Further, absent contrary allegations, it is presumed that the Insurers used standard actuarial methods to account for any additional costs attributable to pharmaceutical companies' co-pay assistance programs and to pass them on to patient beneficiaries and/or employers.  *See id.* at 1364, 1368.[8]  Accordingly, any

---

[8]  Any purported distinction between employer-funded union health benefit plans like the Insurers' and traditional insurance companies is irrelevant.  Regardless of whether an insurer is funded by members' premiums or by employers' fees, all insurers are presumed to apply actuarial methods and to adjust their prices to compensate for known risks.  *See Ironworkers*, 634 F.3d at 1364 n.23 ("Any disparity the plaintiffs perceive between an 'up-front

*(cont'd)*

purported injury arising from the price of the subject drugs is ultimately borne by Plaintiffs' members or their employers, not by the Insurers.  *See id.*  As the Eleventh Circuit explained:

> [W]e must infer from our common understanding of insurance practices – as well as common sense – [that insureds] did not receive this extensive prescription drug coverage for free.  The insurers have pled no facts in the complaint that suggest the insurers established premiums in a way inconsistent with the insurance industry's conventional ratemaking procedures.  We therefore must infer that the insurers do charge premiums established in that conventional manner.

*Id.* at 1368.  Significantly, the Insurers have not alleged they were unable to predict and account for the overall effect of co-pay assistance when setting premiums.[9]

The Insurers cannot save their claims by invoking *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), an antitrust case.  In that case, the Supreme Court held that a direct purchaser can establish antitrust injury by proving that it was illegally overcharged, even if it passed the overcharge on to indirect purchasers.  *See id.* at 494.  In *Hanover Shoe* and subsequent decisions, the Supreme Court established a single level of enforcement for treble damages claims under Section 4 of the Clayton Act, "holding direct purchasers to be injured to the full extent of the overcharge" while "deny[ing] recovery to those indirect purchasers who may have been actually injured by antitrust violations."  *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977).  The Supreme Court adopted this single level of enforcement as a matter of policy, in order to avoid the problem of overlapping and multiple recoveries by different parties in a chain of distribution.  *See id.* at 730-35.

As *Ironworkers* shows, the antitrust rule set forth in *Hanover Shoe* does not apply in RICO cases.  *Cf. Ironworkers*, 634 F.3d at 1367-68.[10]  Moreover, even if *Hanover Shoe* were not limited to antitrust

---

*(cont'd from previous page)*
fee' and a premium is illusory.").

[9] Other courts have reached the same conclusion in the context of insurer lawsuits seeking to recoup medical expenditures attributed to fraudulent marketing by tobacco companies.  For example, the Seventh Circuit affirmed the dismissal of insurers' RICO claims because, inter alia, "[Insurers] are just financial intermediaries.  They collect the premiums and spend them to provide the contracted-for care; their books balance whether the costs of care are high or low. . . . [P]urchasers of insurance, not [insurers], foot the medical bill in the end."  *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 824 (7th Cir. 1999); *accord Serv. Emps., Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001).

[10] *See also Serv. Emps.*, 249 F.3d at 1074; *Local 734*, 196 F.3d at 824, 828.

cases, it would not permit recovery by the plaintiffs in this case.   As a necessary corollary to *Hanover Shoe*'s holding that direct purchasers may sue for overcharges that they passed on to their customers, antitrust suits by indirect purchasers are precluded.  *See Ill. Brick*, 431 U.S. at 730-35, 746.  Because *Illinois Brick* works in tandem with *Hanover Shoe*, the Insurers cannot embrace the latter while denying the former.  Here, the Insurers are not direct purchasers of Pfizer's products; rather, the Insurers reimburse for prescriptions purchased by consumers from retail pharmacies or wholesale mail order companies.  (*See, e.g.*, Compl. ¶¶ 14, 21-23.)  Accordingly, were the Court to conclude that *Hanover Shoe* and *Illinois Brick* apply to the Insurers' RICO claim, it would have to dismiss their claim because the Insurers are not direct purchasers.  *See Carter v. Berger*, 777 F.2d 1173, 1175 (7th Cir. 1985) (finding no proximate cause in RICO claim brought by plaintiff in position of indirect purchaser under *Hanover Shoe*).

## III.   THE INSURERS FAIL TO ADEQUATELY PLEAD THAT THE ALLEGED PREDICATE ACTS WERE CONDUCTED THROUGH A RICO ENTERPRISE

The Insurers' claims also fail to allege the essential element of conduct of an "enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. § 1962(c), because they do not allege that Pfizer conducted an enterprise that was meaningfully distinct from Pfizer itself.  As this Court has recently explained, "[i]t is axiomatic that a RICO person cannot associate with himself and be both the RICO defendant and the RICO enterprise.  There must be distinctiveness between the RICO person and the RICO enterprise." *Rosenson*, 2012 WL 3631308, at *9.

The Insurers attempt to satisfy the distinctiveness requirement by alleging that the RICO enterprises consisted of Pfizer as well as the administrators of the respective co-pay assistance programs, whom the Insurers have not named as defendants.  (Compl. ¶¶ 11-12.)  This attempt fails because the Insurers plead only that TrialCard and PDMI acted on Pfizer's behalf in administering the co-pay assistance programs. (*See* Compl. ¶ 148 (alleging that Pfizer "hired unnamed co-conspirators TrialCard, and PDMI . . . to administer their co-pay subsidy programs" (emphasis added)); *id.* ¶ 213 (alleging that Pfizer "entered into, monitored, and enforced contractual and/or agency arrangements regarding payment and the delivery of services" and "hired the administrators to carry out the program" (emphasis added)).)  Indeed, Plaintiffs do not allege that the administrators took any action in connection with the co-pay assistance programs

17

independent of their role as service providers to Pfizer.

As the Second Circuit has held, "the distinctness requirement may not be circumvented" "by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) (collecting cases). Indeed, "[b]ecause a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself." *Id.*; *see also Cruz v. FXDirectDealer, LLC*, 855 F. Supp. 2d 89, 99 (S.D.N.Y. 2012) (holding that allegations that "the only named defendant . . . acted through its agents . . . to carry out the daily operations of [the company] do not meet the distinctness requirement"). In this case, had Pfizer administered its co-pay assistance programs internally, it would be clear that there was no RICO enterprise, distinct from Pfizer, alleged. The lack of a RICO enterprise is no less patent merely because the Insurers allege that Pfizer outsourced the administration function to service providers. Plaintiffs' RICO claims must therefore be dismissed.

## IV. THE INSURERS HAVE NOT ADEQUATELY ALLEGED RICO CAUSATION

### A. The Insurers' Excess Prescriptions Claim Is Too Attenuated to Satisfy RICO's Proximate Cause Requirement

The Insurers allege that by paying a portion of patients' co-pays, Pfizer created an incentive for physicians to prescribe (or for patients to ask their physicians to prescribe) Pfizer's products instead of other, less expensive alternatives. As discussed in Section I, *supra*, the Insurers have not identified any misrepresentations by Pfizer to any person regarding the terms of its co-pay assistance programs, or that the terms of such programs were concealed from the Insurers. This makes analysis of causation more difficult because, *a priori*, there can be no causation where there is no predicate act to begin with. At the very least, however, the Insurers' claim assumes that, but for Pfizer's conduct, physicians would have prescribed a different medicine or treatment for their patients. This causal theory is too attenuated to satisfy RICO's proximate cause requirement.

The Supreme Court has made clear that "but for" causation is a necessary, but not sufficient, component of a RICO plaintiff's claim. The plaintiff must also prove proximate causation, which requires

"some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *accord Hemi Grp., LLC v. City of N.Y.*, 130 S. Ct. 983, 989 (2010); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006).  "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Grp.*, 130 S. Ct. at 989 (alteration in original) (quoting *Holmes*, 503 U.S. at 271, 274).  As Chief Justice Roberts explained in *Hemi Group*, where a plaintiff's "theory of liability rests on the independent actions of third and even fourth parties," and where "[m]ultiple steps . . . separate the alleged fraud from the asserted injury," causation is not sufficiently direct.  *Hemi Grp.*, 130 S. Ct. at 992; *see also DDR Constr. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 652 (S.D.N.Y. 2011) ("[A] theory of causation that either (A) requires the Court to look much beyond the 'first step' of harm caused, or (B) in which the alleged violation is not 'directly responsible' for the injury but rather allows it to have occurred more easily, cannot meet RICO's standing requirements." (citing *Hemi Grp.*, 130 S. Ct. at 989 90)).  Here, the causal chain for the Insurers' "Excess Prescriptions" theory requires them to show that, but for the co-pay assistance programs, patients would not have sought Pfizer's medications and physicians would not have prescribed them.  This presents precisely the sort of attenuated causal theory (that is, a causal link that turns on the independent decisions of third and fourth parties (here, patients and physicians)) that has been prohibited by the Supreme Court.

Indeed, numerous federal courts, including the Second Circuit, have held that claims by insurers that depend on the prescribing decisions of thousands of non-party physicians do not satisfy RICO's proximate cause requirement.  For example, in *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 3062 (2011), insurers alleged that the defendants' purported misrepresentations regarding the safety and efficacy of Zyprexa had caused them to pay an excess price for Zyprexa prescriptions or, alternatively, for an excess number of Zyprexa prescriptions.  *See id.* at 129.  Applying *Holmes* and *Hemi Group*, the Second Circuit held that the plaintiffs' excess price theory failed to sufficiently allege proximate cause under RICO.  *See UFCW*, 620 F.3d at 133-34.  As the Second Circuit explained:  "The nature of prescriptions . . . means that this theory of causation is interrupted by the independent actions of prescribing physicians, which thwarts any attempt to show proximate cause through generalized proof."  *Id.* at 135.

While the Second Circuit remanded the plaintiffs' excess prescriptions theory because it had not been addressed by the district court (Judge Weinstein), the Second Circuit observed that the excess prescriptions theory "suffers from many of the same faults as the excess price theory." *Id.* at 135. Significantly, Judge Weinstein, in a related case, granted summary judgment dismissing the claims of another insurer asserting an excess prescriptions theory. *See In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397 (E.D.N.Y. 2009) (rejecting claims under individualized proof rule). In another case, *Sergeants Benevolent Association Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, No. 08-CV-0179, 2012 WL 4336218 (E.D.N.Y. Sept. 17, 2012), Magistrate Judge Reyes of the Eastern District recently followed *UFCW* to recommend summary judgment dismissing the plaintiff insurers' claims:

> The Second Circuit found [in *UFCW*] that the causal chain is disrupted not by the "existence of additional actors," but by the independent actions of physicians who make prescribing decisions based on a multitude of factors . . . .
>
> . . . .
>
>    . . . . Although safety may be a fundamental consideration in a physician's prescription decision, individualized proof is required to determine whether a given physician factored Defendants' alleged misrepresentation into his or her decision to prescribe Ketek for either AECB or ABS. Without this proof, causation cannot be established and [the Insurers'] RICO claims fail as a matter of law.

*Id.* at *4. Significantly, in *Sergeants Benevolent Ass'n*, the plaintiffs specifically asserted an excess prescriptions theory of recovery. *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, No. 08-CV-0179, 2011 WL 824607, at *5 (E.D.N.Y. Feb. 16, 2011), *magistrate report adopted*, 2011 WL 1326365 (E.D.N.Y. Mar. 30, 2011).

Indeed, virtually every appellate and district court to have considered the issue has held that RICO claims by health insurers that depend on the independent prescribing decisions of physicians are too attenuated to satisfy RICO's proximate cause requirement. For example, the Ninth Circuit affirmed dismissal of RICO claims by health insurers alleging that a pharmaceutical manufacturer injured them by misrepresenting the safety and efficacy of its products. *See United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010). The Ninth Circuit held, *inter alia*, that "the complaint failed to plead a cognizable theory of proximate causation that links

Amgen's alleged misconduct to Appellant's alleged injury." *Id.* The plaintiffs' "attenuated causal chain . . . involved at least four independent links," including "doctors' decisions to prescribe Aranesp and Epogen for [off-label] uses." *Id.* In light of the multiple steps necessary to tie the defendant's alleged misconduct to the plaintiffs' claimed injuries, the Ninth Circuit concluded that the insurers failed "to satisfy the Supreme Court's proximate causation requirement in the RICO context." *Id.* (citing *Hemi Grp.*, 130 S. Ct. at 989; *Holmes*, 503 U.S. at 268, 271, 274).[11]

Likewise, the Eleventh Circuit rejected an insurer's attempt to establish direct injury by arguing that the prescription drug at issue was medically unnecessary under its plan. Even under this theory, the insurer would have still have to rely upon decisions by intermediaries (such as prescribing physicians) to evaluate the medicine's appropriateness. *See Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401, 407-09 (11th Cir. 2011). And, in *Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, 634 F.3d 1352 (11th Cir. 2011), although the Eleventh Circuit affirmed dismissal of insurers' claims for lack of injury (*see* Section II, *supra*), one judge concurred specially to "express [his] view that there [was] a much simpler reason why the [defendants] should prevail. As the Second Circuit explained in [*UFCW*], the independent decisions of the physicians and other intermediaries involved in Seroquel's allegedly increased usage and pricing eviscerates the chain of causation necessary to demonstrate a RICO violation." *Id.* at 1370 (Martin, J., concurring).[12]

---

[11]  The Ninth Circuit also affirmed dismissal of another RICO case in which insurers had alleged that the defendant caused them to pay excessive amounts for a prescription pharmaceutical product by marketing it for an off-label use, adopting the reasoning of the district court. *See In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1043-45, 1048-53 (N.D. Cal. 2009) (dismissing RICO claims based on off-label marketing), *aff'd*, 464 F. App'x 651 (9th Cir. 2011).

[12]  There is also near unanimity among district courts in rejecting RICO claims by insurers that depend on the independent decisions of thousands of prescribing physicians. *See In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, No. 11-CV-00310, 2012 WL 3154957, at *4-8 (N.D. Cal. Aug. 2, 2012); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 524 (D.N.J. 2011); *Health Care Serv. Corp. v. Olivares*, No. 2:10-CV-221, 2011 WL 4591913, at *7 (E.D. Tex. Sept. 2, 2011), *magistrate report adopted*, No. 2:10-CV-221, 2011 WL 4591915 (E.D. Tex. Sept. 30, 2011); *Ironworkers Local Union No. 68  v. AstraZeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1344 (M.D. Fla. 2008), *aff'd*, 634 F.3d 1352 (11th Cir. 2011); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, Nos. 3:09-md-02100, 3:09-cv-20071, 2010 WL 3119499, at *6-7 (S.D. Ill. Aug. 5, 2010); *Pa. Emps. Benefit Trust Fund v. AstraZeneca Pharm. LP*, No. 6:09-cv-5003, 2009 WL 2231686, at *5-6 (M.D. Fla. July 20, 2009); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604, at *23-26 (D.N.J. July 10, 2009).

Finally, the Insurers' excess prescriptions theory fails to state a viable claim for an additional reason:  they cannot possibly prove in one case which prescriptions would not have been filled absent Pfizer's conduct.  Significantly, in *UFCW*, the Second Circuit expressly rejected the plaintiffs' proffer of aggregate proof in support of their excess prescriptions theory.  As the Second Circuit explained, "[t]he nature of prescriptions . . . means that this theory of causation is interrupted by the independent actions of prescribing physicians, which thwarts any attempt to show proximate cause through generalized proof." *UFCW*, 620 F.3d at 135.  Not only is a physician's decision influenced by an "individual patient's diagnosis, past and current medications being taken by the patient, [and] the physician's own experience," "general proof is precluded by uncertainty about what the alternatives to an 'excess' prescription would have been." *Id.*

And, as Judge Weinstein has explained, general proof in support of an excess prescriptions theory is prohibited regardless of whether it is offered on behalf of a putative class or an individual insurer.  As he explained in *In re Zyprexa Products Liability Litigation*, 671 F. Supp. 2d 397 (E.D.N.Y. 2009), cases based on such a theory are no different structurally from class actions and are thus barred under an "individualized proof rule," *see id.* at 453, because "[e]ach decision by each doctor and each patient was different," and it would be "simply impossible, or close to it, to determine the individual thought process of each of the thousands of doctors and patients involved." *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, No. 05-3700, 2010 U.S. Dist. LEXIS 142767, at *23-24 (E.D. La. Mar. 31, 2010).   Numerous other district courts have also refused to allow insurers to rely on aggregate allegations or evidence regarding what prescribing physicians would have done but for defendant's conduct.[13]

### B.    The Insurers' Excess Price Theory Fails for Lack of Causation

The Insurers likewise fail to sufficiently plead causation under their "Excess Price" theory:  the Insurer's assertion that Pfizer made misrepresentations – either directly to publishers (*see, e.g.*, Compl.

---

[13]    *See In re Bextra*, 2012 WL 3152957, at *6; Dist. 1199P, 784 F. Supp. 2d at 524-25; *In re Yasmin*, 2010 WL 3119499, at *7; *In re Vioxx*, 2010 U.S. Dist. LEXIS 142767, at *21-25; *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270, 1283 (S.D. Fla. 2009); *Pa. Emps. Benefit Trust Fund*, 2009 WL 2231686, at *5-6; *In re Schering*, 2009 WL 2043604, at *26.

¶ 220) or indirectly through pharmacies (*see, e.g., id.* ¶ 219) – regarding unspecified "benchmark" rates for reimbursement of the subject drugs.

These allegations are insufficient because the Insurers do not allege that they or any third party relied on Pfizer's purported misrepresentations.  As the Supreme Court made clear in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), even if first-party reliance is not strictly required, RICO plaintiffs generally cannot prevail "without showing that someone relied on the defendant's misrepresentations."  *Id.* at 658 (emphasis in original); *see also UFCW*, 620 F.3d at 133 ("[W]hile reliance may not be an element of the cause of action, there is no question that in this case the plaintiffs . . . must prove[] third-party reliance as part of their chain of causation."); *Sergeants Benevolent Ass'n*, 2012 WL 4336218, at *3 (observing that while "[t]he Supreme Court has held that a plaintiff alleging a RICO violation need not demonstrate first person reliance to establish causation, . . . proof of at least third-party reliance is required").  Here, Plaintiffs do not allege that insurers, the publishers of AWPs or anyone else was unaware of the existence of coupon programs, that they believed Pfizer's reported benchmark prices accounted for the existence of co-pay subsidies, or that they were otherwise deceived by Pfizer.

## V.  THE INSURERS' COMPLAINT FAILS TO STATE A CLAIM UNDER THE ROBINSON-PATMAN ACT AND MUST BE DISMISSED

The Insurers' claim that Pfizer's co-pay subsidy programs violate Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), is clearly without merit.  Indeed, their effort to recast Pfizer's co-pay subsidy programs – which inarguably provide consumers with more purchasing options – as an illegal, anticompetitive practice is a proverbial attempt to fit a square peg into a round hole.

The Robinson-Patman Act is an antitrust statute that prevents a seller from practicing price discrimination between similarly situated customers.  *See FTC v. Henry Broch & Co.*, 363 U.S. 166, 168 (1960).  Section 2(c) prohibits a seller from disguising discriminatory prices available to certain customers by making unnecessary "brokerage" payments to those customers.  *See* 15 U.S.C. § 13(c) ("It shall be unlawful . . . to pay . . . anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods . . . .").  As the Second Circuit has explained:

> Courts and commentators are in agreement that § 2(c) was enacted primarily to target the practice of "dummy brokerages" whereby large retail buying groups – such as large grocery store chains, which, unlike smaller stores, did not need to use intermediary brokers to purchase their merchandise – would require suppliers to pay fees to "dummy brokers," who then passed the fees on to the large retailer, effectively reducing the price the retailer paid for the goods.

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 221 (2d Cir. 2004); *accord Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 371 (3d Cir. 1985). However, the Insurers do not allege price discrimination through "dummy" brokerage payments or any similar misconduct. Instead, they predicate their Section 2(c) claim on allegations that Pfizer's co-pay subsidy programs amount to illegal "commercial bribes" to consumers. (Compl. ¶¶ 6, 245-57.) To the extent that Section 2(c) even prohibits "commercial bribery," the Insurers do not state a cognizable claim for commercial bribery. Moreover, the Insurers lack antitrust standing to pursue their claim because they neither sustained a competitive injury nor are they direct purchasers of any Pfizer product. Accordingly, their Robinson-Patman Act claim should be dismissed.

**A.      The Insurers' Complaint Does Not State a Claim for Commercial Bribery**

The Second Circuit has cautioned that "[e]ven assuming that a § 2(c) claim could be based on commercial bribery, a necessary requirement for stating such a claim would be allegations sufficient to establish commercial bribery." *Blue Tree Hotels*, 369 F.3d at 221.[14] Pfizer's co-pay subsidiary programs do not constitute "commercial bribery" for three independent but interrelated reasons. First, even though the alleged "bribe" must cause a breach of a fiduciary duty, consumers who utilize co-pay assistance programs do not owe a fiduciary duty to their insurance companies or other insurers. Second, commercial bribery is a two-way street: One cannot be guilty of paying a commercial bribe unless someone else is guilty of receiving it, a fact not alleged in the Complaint. Third, even though the "bribe" must be paid in secret, the Insurers fail to allege any facts to support this requirement.

---

[14]   In *Blue Tree Hotels*, the Second Circuit declined to reach the question of "whether – and under what circumstances – commercial bribery can form the basis of a claim under § 2(c)" because plaintiff's allegations were insufficient to establish commercial bribery. *Blue Tree Hotels*, 369 F.3d at 221. Still, the Second Circuit explained that "commercial bribery" is "far removed from the paradigmatic 'dummy brokerage' scheme." *Id.*

### 1.     The Insurers Do Not Allege Any Payments to a Fiduciary

The Insurers fail to state a claim for commercial bribery because they have not alleged a bribe to an "'employee, agent or fiduciary [of any of the Insurers].'"  *Blue Tree Hotels*, 369 F.3d at 222 (quoting N.Y. Penal L. § 180.00).  "[A] critical element of commercial bribery is the breach of the duty of fidelity."  *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 737 n.4 (3d Cir. 2004).  District court decisions within this Circuit that "have recognized Section 2(c) claims based upon allegations of commercial bribery . . . have 'involv[ed] a breach of fiduciary duty by the buyer's agent.'"  *Dayton Superior Corp. v. Marjam Supply Co.*, No. 07 CV 5215, 2011 WL 710450, at *15 (E.D.N.Y. Feb. 22, 2011) (second alteration in original) (citation omitted).[15]  Thus, courts routinely dismiss commercial bribery claims that fail to adequately allege the existence of a fiduciary relationship.  *See, e.g.*, *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F. Supp. 2d 385, 397 (S.D.N.Y. 2001), *aff'd sub nom. United Magazine Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008); *Zeller Corp. v. Federal-Mogul Corp.*, No. 3:95CV7501, 1996 WL 903951, at *3-4 (N.D. Ohio July 25, 1996).

Here, the Insurers do not allege that a fiduciary relationship exists between the individual insureds who receive co-pay subsidies and their insurers – let alone that such a relationship was breached.  Indeed, it would be absurd to suggest that individuals owe any fiduciary obligation to their insurers in the context of their selection, in consultation with their physicians, of particular medications as a method of treatment.  *Cf. Ironworkers*, 634 F.3d at 1363 (physicians owe no "professional duty to consider a drug's price when making a prescription decision").[16]

---

[15]   *See also Philip Morris, Inc. v. Grinnell Lithographic Co.*, 67 F. Supp. 2d 126, 128 (E.D.N.Y. 1999) (plaintiff alleged that defendant bribed plaintiff's purchasing agent in return for favorable purchasing process); *Roosevelt Sav. Bank v. Eveready Maint. Supply Co.*, No. 85 CV 245, 1987 WL 30194, at *1 (E.D.N.Y. Dec. 2, 1987) (same).  In *Gregoris Motors v. Nissan Motor Corp. in USA*, 630 F. Supp. 902 (E.D.N.Y. 1986), the plaintiff auto dealership alleged that its competitors bribed a car manufacturer's employees to secure more favorable treatment.  *Id.* at 910.

[16]   The Insurers seek to obfuscate this deficiency by alleging that individual insureds "act on behalf of their health benefit providers in having substantial control in the choice of which medications will be paid for by the health benefit providers and . . . act subject to their health benefit providers' direct and indirect control in seeking payment for the selected medication through the terms of their plans."  (Compl. ¶ 255.)  This is an unwarranted legal conclusion that should be afforded no weight.  An agency relationship requires the agent's consent to act on behalf of the principal and the principal's right to control the agent's acts.  Restatement (Third) of Agency § 1.01 (2006).  Contrary to Plaintiffs' allegations, insureds do not act on behalf of insurance companies.  Nor do insurance companies *(cont'd)*

> **2.      The Insurers Do Not Allege That Consumers Who Participated in Pfizer's Co-Pay Subsidy Programs Knowingly Accepted Bribes**

The Insurers' commercial bribery claim is further deficient because they do not allege that consumers solicited or accepted bribes from Pfizer.  As the Second Circuit made clear, the essence of commercial bribery is an illicit agreement between the bribe payor and the bribe taker to breach a fiduciary duty:  "[C]ommercial bribery cannot be committed unilaterally by an alleged bribe receiver:  one cannot be guilty of receiving a commercial bribe unless someone else is guilty of paying it."  *Blue Tree Hotels*, 369 F.3d at 222.

In this instance, Plaintiffs' case "suffers from the opposite problem – one cannot be guilty of paying a commercial bribe unless someone else is guilty of receiving it."  *Monsieur Touton Selection, Ltd. v. Future Brands, LLC*, No. 06 Civ 1124, 2006 WL 2192790, at *7 (S.D.N.Y. Aug. 1, 2006) (Scheindlin, J.) (dismissing claim brought under Section 2(c)).  The Insurers specifically allege that "[i]ndividual insureds who accept rebates under defendants' co-pay subsidy programs . . . do not know these co-pay subsidies are bribes."  (Compl. ¶ 255.)  By admitting that individual insureds who accept rebates are not guilty of receiving commercial bribes, the Insurers have effectively pled themselves out of court.

> **3.      The Insurers Do Not Allege That the Co-Pay Subsidy Programs Are Secret**

The Insurers' commercial bribery claim suffers from a third fatal flaw:  the inability to allege that the co-pay subsidies are "secret."  Courts have regularly held that commercial bribery claims under Section 2(c) fail where the principal was aware of the alleged bribes.  *See Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 713 F. Supp. 937, 942 (E.D. Va. 1989), *aff'd*, 903 F.2d 988 (4th Cir. 1990); *Burge v. Bryant Pub. Sch. Dist.*, 520 F. Supp. 328, 332-33 (E.D. Ark. 1980), *aff'd*, 658 F.2d 611 (8th Cir. 1981); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 447 F. Supp. 867, 883 (S.D.N.Y. 1978), *rev'd on other grounds*, 602 F.2d 1025 (2d Cir. 1979).[17]  As discussed above, the Insurers do not allege that they were unaware of

---

*(cont'd from previous page)*

exercise the type of control over their insureds required to establish an agency relationship.

[17]  *See also* 14 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law:  An Analysis of Antitrust Principles and Their Application* ¶ 2362i (3d ed. 2012) ("Most courts hold that [section 2(c)] does not apply where the principal actually knew that the agent was accepting payments in order to obtain transactions."); Letter from FTC Bureau of Competition to Maritz, Inc. (June 21, 1984), *reported in* 47 Antitrust & Trade Reg. Rep. (BNA) 16 (July 5, 1984)

*(cont'd)*

the co-pay subsidy programs, or that these programs are secret in any way. *See supra* at 2, 8. The Insurers' awareness of the co-pay subsidy programs and the alleged notoriety of these programs precludes any claim for commercial bribery.

**B.     The Insurers Do Not Have Antitrust Standing to Pursue Their Claim**

It is well recognized that Section 2(c) does not create a private right of action; instead, "the private right of action for a § 2(c) Robinson-Patman Act claim, as for all private plaintiff antitrust rights of action, is provided by § 4 of the Clayton Act." *2660 Woodley*, 369 F.3d at 738. Because the Insurers cannot establish antitrust standing, as required under Section 4 of the Clayton Act, their claim should be dismissed. *See Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006).

First, the Insurers' purported injury is too remote from the alleged misconduct to give rise to antitrust standing under Section 4 of the Clayton Act. In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), the Supreme Court held that a plaintiff that "was neither a consumer nor a competitor in the market in which trade was restrained" lacked standing to bring an antitrust claim. *Id.* at 539. Courts applying *Associated General Contractors* "have typically limited the types of individuals that may bring an antitrust action to direct competitors and consumers." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, No. 05 Civ. 4294, 2006 WL 2786882, at *3 (E.D.N.Y. Sept. 26, 2006), *aff'd*, 507 F.3d 117 (2d Cir. 2007); *accord Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 184 (3d Cir. 1997). For this reason, the district court decisions in this Circuit that have recognized commercial bribery as a cause of action under Section 2(c) have involved claims brought either by competitors that allegedly were disadvantaged by the alleged bribes or by purchasers that allegedly were overcharged due to the alleged bribery activity.[18]

In this case, the Insurers are neither Pfizer's competitors, nor consumers of its prescription drugs.

---

*(cont'd from previous page)*
(Federal Trade Commission staff noted that courts have "made secrecy an essential element of a commercial bribery violation").

[18]   *See Philip Morris, Inc.*, 67 F. Supp. 2d at 128-29 (claim brought by allegedly overcharged purchaser); *Roosevelt Sav. Bank*, 1987 WL 30194, at *1 (same); *Gregoris Motors*, 630 F. Supp. at 909-10 (claim brought by allegedly disadvantaged competitor).

While the Insurers allege that they "pay for" the drugs that are the subject of the co-pay subsidy programs (Compl. ¶ 25), they cannot be characterized properly as consumers or buyers of these drugs simply because they provide reimbursement for purchases made by individual insureds.  *See Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 2d 695, 721 (M.D. Pa. 2006).

Even if the Insurers were considered "buyers" of Pfizer's prescription drugs, they still would be unable to establish standing because they do not make purchases directly from Pfizer.  Under long-standing Supreme Court precedent, indirect purchasers lack standing to pursue claims under Section 4 of the Clayton Act.  *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977).  As the Insurers acknowledge in their Complaint, pharmaceutical manufacturers like Pfizer sell their prescription drugs directly to wholesalers or retailers, not to insurers.  (Compl. ¶ 57.)  Though the Insurers claim that they have suffered damages in the form of "overpayments" for prescription drugs (*id.* ¶ 7), their payments have not been directed to Pfizer, but to retail pharmacies (*id.* ¶ 58).  Therefore, to the extent the Insurers could be viewed as "buyers" of Pfizer's prescription drugs, they are indirect purchasers that lack standing under section 4 of the Clayton Act.

## CONCLUSION

For all the foregoing reasons, the Insurers have failed to plead a plausible claim under either RICO or the Robinson-Patman Act, and the Complaint thus should be dismissed.  Further, several of the fatal deficiencies in the Complaint (*e.g.*, the remoteness of their RICO claims, the lack of cognizable injury, and the lack of antitrust standing) cannot be cured.  Accordingly, Pfizer respectfully asks that the Complaint be dismissed with prejudice.

Dated:  New York, New York
       October 16, 2012             Respectfully submitted,

                                   By: /s/ Sheila L. Birnbaum
                                   Sheila L. Birnbaum
                                   Katherine Armstrong
                                   SKADDEN, ARPS, SLATE,
                                     MEAGHER & FLOM LLP
                                   Four Times Square
                                   New York, NY  10036
                                   Tel.: (212) 735-2450
                                   Fax: (917) 777-2450
                                   Email:  Sheila.Birnbaum@skadden.com
                                   Email:  Katherine.Armstrong@skadden.com

                                   John H. Beisner (admitted PHV)
                                   SKADDEN, ARPS, SLATE,
                                   MEAGHER & FLOM LLP
                                   1440 New York Avenue, N.W.
                                   Washington, DC 20005
                                   Tel.: (202) 371-7000
                                   Fax: (202) 393-5760
                                   Email: John.Beisner@skadden.com

                                   *Counsel for Defendant Pfizer Inc.*